Michael F. Scanlon, Esq. (DC Bar #479777)
Michael.Scanlon@klgates.com
**K&L GATES LLP**
1601 K Street, N.W.
Washington, DC   20006
Telephone:     (202) 778-9000
Facsimile:     (202) 778-9100

J. Timothy Hobbs, Esq. (*pro hac vice* pending)
Tim.Hobbs@klgates.com
**K&L GATES LLP**
925 Fourth Avenue, Suite 2900
Seattle, WA  98104
Telephone:     (206) 623-7580
Facsimile:     (206) 623-7022

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KEITH GUINDON,<br>3414 Cemetery Rd<br>Santa Fe, TX 77517 | No. |
| KATIE'S SEAFOOD MARKET, LLC.<br>1902 Wharf Rd.<br>Galveston, TX 77550 | COMPLAINT FOR DECLARATORY<br>AND  INJUNCTIVE RELIEF |
| WAYNE WERNER<br>16731 NW 173rd Terrace<br>Alachua, FL 32615 | EXPEDITED REVIEW REQUESTED<br>PURSUANT TO 16 U.S.C. §<br>1855(f)(4) |
| DONALD A. WATERS<br>800 Lakewood Rd.<br>Pensacola, FL 32507 | |
| DAVID KREBS<br>712 Planet Dr.<br>Destin, FL 32541 | |
| ARIEL SEAFOODS OF FLORIDA, INC.<br>419 Mountain Dr.<br>Destin, FL 32541 | |
| F/V DREAMCATCHER, INC.<br>509 Benning Dr.<br>Destin, FL 32541 | |

1

RUSSELL UNDERWOOD
607 Carolina Ave.
Lynn Haven, FL 32444

GLENHART BROOKS III
4082 W. Brooks Gang Ct.
Bradenton, FL 34280

JOHN ANDERSON
6707 N. Lagoon Dr.
Panama City, FL 32408

BUCCANEER FISH CO., INC.
6707 N. Lagoon Dr.
Panama City, FL 32408

JAMES M. CLEMENTS
604 Gulf Ave.
Carrabelle, FL 32322

BARTHOLOMEW NIQUET
401 Florida Ave.
Lynn Haven, FL 32444

CHRISTOPHER NIQUET
731 New York Ave.
Lynn Haven, FL 32444

WILLIAM COCHRANE
921 Marine Dr., Apt. 106
Galveston, TX 77550

JAMES M. WHITFIELD
1210 Georgia Ave.
Lynn Haven, FL 32444

LEWIS T. BESSINGER
654 Warsaw St.
Bayou Vista, TX 77563

BLUE DOLPHIN FISHING, INC.
654 Warsaw St.
Bayou Vista, TX 77563

LINDA BOVAIRD
654 Warsaw St.
Bayou Vista, TX 77563

DAVID WALKER
401 Diane Dr.
Andalusia, AL 36420

WALKER FISHING FLEET, INC.
401 Diane Dr.
Andalusia, AL 36420

WILLIAM WRIGHT
921 Marine Dr., Apt. 101
Galveston, TX 77550

A&B SEAFOOD, INC.
8817 Stewart Rd. No. 56
Galveston, TX 77550

QUALITY AMERICAN SEAFOOD, LLC
7079 N. Holiday Dr.
Galveston, TX 77550

KENNETH GUINDON
7811 Larkspur Dr.
Texas City, TX 77591

MARTIN ARNOLD
213 Byrd Parker Drive
Wewahitchka, FL 32465

FISH FOR AMERICA, LLC
111 Gentian Road
Saint Augustine, FL 32086

GULF FISHERMEN'S ASSOCIATION, INC.
1336 Bayview Dr.
Clearwater, FL 33756

and

GULF OF MEXICO REEF FISH
SHAREHOLDERS' ALLIANCE
111 Gentian Road
Saint Augustine, FL 32086

                             Plaintiffs,

      v.

PENNY SUE PRITZKER, in her official
capacity as Secretary of the United States
Department of Commerce
Office of the Secretary

Room 5858
14th St. and Constitution Ave., NW
Washington, DC 20230

NATIONAL OCEANIC AND
ATMOSPHERIC ADMINISTRATION
Department of Commerce
Room 5128
14th St. and Constitution Ave., NW
Washington, DC 20230

and

NATIONAL MARINE FISHERIES
SERVICE
Department of Commerce
Room 14636
1315 East-West Highway
Silver Spring, MD 20910

                    Defendants.

## I.      INTRODUCTION

1.      This case is a follow-on challenge to the defendants' mismanagement of the Gulf of Mexico red snapper fishery.  Defendants' failure to effectively manage the red snapper fishery has resulted in chronic overharvesting by the recreational fishing sector. Overharvesting by the  recreational sector undermines the conservation goal of rebuilding the red snapper stock and harms all stakeholders in the fishery.

2.      Plaintiffs filed an earlier suit challenging defendants' management actions for 2013. *See Guindon v. Pritzker*, No. 1:13-cv-988-BJR.  That suit is pending before this Court. This suit challenges defendants' management actions for 2014.

3.      Plaintiffs are commercial fishermen and related business and associations ("Plaintiffs") that are harmed by the mismanagement of the red snapper fishery by the defendants, the Secretary of Commerce acting through the National Oceanic and Atmospheric

Administration and the National Marine Fisheries Service (collectively, "NMFS").  Plaintiffs challenge a regulatory action by NMFS setting the recreational fishing season for 2014 because that action, which fails to include any effective management or accountability measures to control overharvesting by the recreational sector, will invariably prove ineffective like all prior actions that failed to include such measures, including the 2013 measures. Plaintiffs seek declaratory and such other relief as the Court deems appropriate because NMFS's failure to effectively manage the red snapper fishery in 2014 violates the Magnuson-Stevens Fishery Conservation and Management Act, the Administrative Procedure Act, and the National Environmental Policy Act.

## II.       JURISDICTION AND VENUE

4.       This action arises under the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), 16 U.S.C. §§ 1801-1884; the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, and the National Environmental Policy Act of 1969 as amended ("NEPA"), 43 U.S.C. §§ 4321 *et seq.*

5.       This Court has jurisdiction over this action pursuant to the MSA, which provides that "[t]he district courts of the United States shall have exclusive jurisdiction over any case or controversy arising under" the MSA. 16 U.S.C. § 1861(d). The MSA also provides that actions taken by NMFS under regulations implementing a fishery management plan ("FMP") shall be subject to judicial review "if a petition for such review is filed within 30 days after the date on which the regulations are promulgated or the action is published in the Federal Register, as applicable." 16 U.S.C. § 1855(f).  The Plaintiffs are challenging a temporary rule published by NMFS in the Federal Register on December 19, 2013, 78 Fed.

Reg. 76758 (Dec. 19, 2013) ("Final Rule").  Plaintiffs filed this Complaint within thirty (30) days after publication in the Federal Register of the Final Rule.

6.      This Court further has jurisdiction over this action pursuant to the APA, which provides that final agency action for which there is no other adequate remedy in a court is subject to judicial review.  5 U.S.C. §§ 701-706.

7.      This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), which grants the district courts "original jurisdiction of all civil actions arising under the . . . laws . . . of the United States," and 28 U.S.C. § 1361, which grants the district courts "original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

8.      This Court has the authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and may grant relief pursuant to the MSA, 16 U.S.C. §§ 1861(d) and 1855(f), as well as the APA, 5 U.S.C. § 706.

9.      Venue is properly vested in this judicial district under 28 U.S.C. § 1391(b) and (e), because the defendants are officers or employees of the United States and are located in this district and because a substantial part of the events and omissions which gave rise to this action occurred in this district.

### III.    PARTIES

10.     Plaintiff Keith Guindon ("Guindon") is a commercial fisherman residing in Santa Fe, Texas.  Guindon holds Individual Fishing Quota ("IFQ") shares for Gulf of Mexico

red snapper ("red snapper").  Guindon owns and operates the fishing vessels Falcon, Katie Marie, Avenger, Voyager, and Kathleen M.

11.     Plaintiff Katie's Seafood Market, LLC ("Katie's Seafood") is a limited liability company organized under the laws of the State of Texas and located in Galveston, Texas. Katie's Seafood is a commercial fish and seafood market.  Plaintiff Guindon is the owner and president of Katie's Seafood.

12.     Plaintiff Wayne Werner ("Werner") is a commercial fisherman residing in Alachua, Florida.  Werner holds IFQ shares for red snapper.  Werner owns and operates the fishing vessel Sea Quest.

13.     Plaintiff Donald A. Waters ("Waters") is a commercial fisherman residing in Pensacola, Florida.  Waters holds IFQ shares for red snapper.  Waters owns and operates the fishing vessels Hustler and Barely Legal. Waters is the owner and managing member of Waters Fishing, LLC which holds IFQ shares for red snapper.

14.     Plaintiff David Krebs ("Krebs") is a commercial fisherman residing in Destin, Florida.  Krebs holds IFQ shares for red snapper.  Krebs owns and operates the fishing vessel Wanda.

15.     Plaintiff Ariel Seafoods of Florida, Inc. ("Ariel Seafoods") is a corporation organized under the laws of the State of Florida and located in Destin, Florida.  Ariel Seafood is a commercial fish and seafood business.  Plaintiff Krebs is the owner and president of Ariel Seafoods.

16.     Plaintiff F/V Dreamcatcher, Inc. ("Dreamcatcher") is a corporation organized under the laws of the State of Florida and located in Destin, Florida.  Dreamcatcher holds IFQ

shares for red snapper.  Dreamcatcher owns and operates the fishing vessel Nan Baldwin. Plaintiff Krebs is the owner and president of Dreamcatcher.

17.     Plaintiff Russell Underwood ("Underwood") is a commercial fisherman residing in Lynn Haven, Florida.  Underwood holds IFQ shares for red snapper.  Underwood owns and operates the fishing vessels Last Time, Connie Marie, Malcolm B., Laura Ann, Char-Ma-Ann, Norman B., and Carolina Princess.

18.     Plaintiff Glenhart Brooks III ("Brooks") is a commercial fisherman residing in Bradenton, Florida.  Brooks holds IFQ Shares for red snapper.  Brooks owns and operates the fishing vessels Miss Gail, Miss Donna, and Neptune I.

19.     Plaintiff John Anderson ("John") is a commercial fisherman residing in Panama City, Florida.  John holds IFQ shares for red snapper.  John owns and operates the fishing vessel Pisces.

20.     Plaintiff Buccaneer Fish Company, Inc. ("Buccaneer Fish") is a corporation organized under the laws of the State of Florida and located in Panama City, Florida. Buccaneer Fish is a commercial fish and seafood business.  Plaintiff John is the owner and president of Buccaneer Fish.

21.     Plaintiff James M. Clements ("Clements") is a commercial fisherman residing in Carrabelle, Florida.  Clements is the owner and president of Captain Jim's Charters, Inc., which holds IFQ shares for red snapper.

22.     Plaintiff Bartholomew Niquet ("B. Niquet") is a commercial fisherman residing in Lynn Haven, Florida.  B. Niquet holds IFQ shares for red snapper.  B. Niquet owns and operates the fishing vessel Galilean and operates the fishing vessel Nina.

23.      Plaintiff Christopher Niquet ("C. Niquet") is a commercial fisherman residing in Lynn Haven, Florida.  C. Niquet leases annual IFQ allocation to engage in the commercial red snapper fishery in the Gulf of Mexico and operates the fishing vessel Nina.

24.      Plaintiff William Cochrane ("Cochrane") is a commercial fisherman residing in Galveston, Texas.  Cochrane holds IFQ shares for red snapper.  Cochrane owns and operates the fishing vessel Chelsea Ann.

25.      Plaintiff James M. Whitfield ("Whitfield") is a commercial fisherman residing in Lynn Haven, Florida.  Whitfield owns IFQ shares for red snapper.

26.      Plaintiff Lewis T. Bessinger ("Bessinger") is a commercial fisherman residing in Bayou Vista, Texas.  Bessinger operates the fishing vessel Ironsides.

27.      Plaintiff Linda Bovaird ("Bovaird") is the owner and sole shareholder of Blue Dolphin Fishing, Inc. and resides in Bayou Vista, Texas.

28.      Plaintiff Blue Dolphin Fishing, Inc. ("Blue Dolphin") is a corporation organized under the laws of the State of Florida and located in Bayou Vista, Texas.  Blue Dolphin holds IFQ shares for red snapper.  Blue Dolphin is a commercial fishing business that owns and operates the fishing vessel Ironsides.  Plaintiff Bovaird is the corporate secretary and treasurer of Blue Dolphin and Plaintiff Bessinger is the president of Blue Dolphin.

29.      Plaintiff David Walker ("Walker") is a commercial fisherman residing in Andalusia, Alabama.

30.      Plaintiff Walker Fishing Fleet, Inc. ("Walker Fishing") is a corporation organized under the laws of the State of Florida with its principal place of business in Niceville, Florida.  Walker Fishing is a commercial fishing business that owns and operates

the fishing vessel June Sue.  Walker Fishing holds IFQ shares for red snapper.  Plaintiff Walker is the owner and president of Walker Fishing.

31.    Plaintiff William Wright ("Wright") is a commercial fisherman residing in Galveston, Texas.  Wright holds IFQ shares for red snapper.

32.    Plaintiff A&B Seafood, Inc. ("A&B Seafood") is a corporation organized under the laws of the State of Texas and located in Galveston, Texas.  A&B Seafood is a commercial fishing business which holds IFQ shares for red snapper.  A&B Seafood owns the fishing vessel Alice Mae.  Plaintiff Wright is the owner and president of A&B Seafood.

33.    Plaintiff Quality American Seafood, LLC ("Quality American") is a limited liability company organized under the laws of the State of Texas and located in Galveston, Texas.  Quality American is a commercial fishing business.  Plaintiff Wright is an owner and member of Quality American.

34.    Plaintiff Kenneth Guindon ("Kenneth") is a commercial fisherman residing in Texas City, Texas.  Kenneth leases annual IFQ allocation to engage in the commercial red snapper fishery.

35.    Plaintiff Martin Arnold ("Arnold") is a commercial fisherman residing in Wewahitchka, Florida.  Arnold owns and operates the fishing vessels Sea Breeze, Sir Martin E, Wolf, K.D.S., Bout Time and Wayward Wind.  Arnold is the owner of Fishing Vessel Bouttime, LLC and Seminole Wind Fishing, Inc., which holds IFQ shares for red snapper and owns the fishing vessel Seminole Wind.

36.    Plaintiff Fish for America, LLC ("Fish for America") is a limited liability corporation organized under the laws of the State of Florida and located in St. Augustine,

Florida.   Fish for America advocates on behalf of commercial fishermen in the Gulf of Mexico and seafood consumers nationwide.

37.     Plaintiff Gulf Fishermen's Association, Inc. ("GFA") is a nonprofit corporation organized under the laws of the State of Florida and located in Clearwater, Florida.   GFA represents offshore fishermen in the southeastern United States.

38.     Plaintiff Gulf of Mexico Reef Fish Shareholders' Alliance ("GMRFSA") is a nonprofit corporation organized under the laws of the State of Texas and located in Galveston, Texas.   GMRFSA is a trade organization representing commercial fishermen in the Gulf of Mexico.

39.     Defendant Penny Sue Pritzker is the Secretary of the U.S. Department of Commerce.   She is sued in her official capacity as the Secretary of Commerce and as the chief officer of the National Oceanic and Atmospheric Administration.

40.     Defendant National Oceanic and Atmospheric Administration ("NOAA") is an agency of the U.S. Department of Commerce with supervisory responsibility for the National Marine Fisheries Service.   The Secretary of Commerce has delegated responsibility for managing U.S. marine fisheries to NOAA, which in turn has further delegated that responsibility to the National Marine Fisheries Service.

41.     Defendant National Marine Fisheries Service is an agency of the U.S. Department of Commerce that has been delegated the primary responsibility to manage United States marine fisheries through its approval of fishery plans, plan amendments, and regulations implementing those plans and plan amendments.   This lawsuit concerns actions of the Southeast Regional Office of NMFS.

## IV.    FACTUAL BACKGROUND

### A.  Statutory Framework

42.    The MSA governs the management of marine fisheries in the U.S. Exclusive Economic Zone ("federal waters").  Under the MSA, the country is divided into eight regions, with each region having a regional fishery management council that is charged with managing the marine fisheries in its respective jurisdiction.  *See* 16 U.S.C. § 1852.  The Secretary of Commerce ("Secretary") appoints most members of the regional councils from among lists of nominees submitted by the governors of coastal states.  *Id*. § 1852(b)(2)(C).  The Secretary must ensure a fair and balanced apportionment among competing interests.  *Id*. §§ 1852(b)(2)(B).  Membership on the regional councils also includes officials of state and federal agencies with authority to manage fisheries who serve *ex officio*.  *Id*. § 1852(b)(1).

43.    The regional fishery management councils develop measures to manage stocks of fish under their respective jurisdictions and propose those management measures to the Secretary.  *Id*. § 1852(h).  The Secretary, acting through NOAA and its subagency, NMFS, must approve the proposed measures if consistent with the MSA and other laws and, where appropriate, promulgate the necessary federal regulations.  *Id*. § 1854.

44.    The numerous species of reef fish in the Gulf of Mexico are managed as a complex by the Gulf of Mexico Fishery Management Council ("Gulf Council").  16 U.S.C. § 1802(a)(1)(E); *see also* 50 C.F.R. § 622, Appendix A, Table 3 (listing Gulf of Mexico reef fish species).  The Gulf Council originally implemented a fishery management plan for reef fish (the "Reef Fish FMP") in 1981.  The Reef Fish FMP has been amended several times.

The Reef Fish FMP as amended and all implementing regulations were developed and approved under the authority of the MSA and must comply with the MSA's provisions.

**B.  Management of Red Snapper in the Gulf of Mexico**

45.     Gulf of Mexico red snapper are managed under the Reef Fish FMP.  The Reef Fish FMP and its implementing regulations establish measures to regulate commercial and recreational fishing activities that target red snapper.

46.     NMFS designated red snapper as overfished in 1988.  A stock of fish is considered overfished when its biomass has declined below a level that jeopardizes the capacity of the stock to produce the maximum sustainable yield ("MSY") on a continuing basis.  *See* 16 U.S.C. § 1802(34); 50 C.F.R. § 600.310(e)(2)(i)(E).

47.     In 2004, the Gulf Council approved Amendment 22 to the Reef Fish FMP, which established a rebuilding plan for red snapper that was projected to end overfishing by 2010 and to rebuild the stock by 2032.

48.     In 2012 NMFS determined that the red snapper stock was no longer subject to overfishing.  Overfishing occurs when a stock of fish is subject to a level of fishing mortality or annual catch that jeopardizes the capacity of the stock or stock complex to produce MSY on a continuing basis.  *See* 50 C.F.R. § 600.310(e)(2)(i)(B).  Although overfishing of the red snapper stock has ended and the stock is rebuilding, NMFS still considers the stock to be overfished and projects it will not be fully rebuilt until 2032 pursuant to the rebuilding plan implemented in 2004.

49.     In order to prevent overfishing and achieve rebuilding as required by the MSA, the Gulf Council develops, and NMFS approves, annual catch limits ("ACLs") for the red

snapper fishery.   *See* 16 U.S.C. § 1853(a)(15) (FMPs shall "establish a mechanism for specifying annual catch limits").

50.    The red snapper ACL is divided into commercial and recreational sector ACLs.   The FMP provides that 51 percent of the ACL will be allocated to the commercial sector ACL.   The FMP provides that the remaining 49 percent of the ACL will be allocated to the recreational sector ACL.   The allocation between the commercial and recreational sectors was established by Amendment 1 to the Reef Fish FMP in 1990 and is still controlling today.

51.    In order to set the red snapper commercial and recreational sector ACLs, the Gulf Council's Scientific and Statistical Committee ("SSC") first establishes the Overfishing Limit ("OFL").   The OFL is a scientific estimate of the catch above which overfishing is occurring.   *See* 50 C.F.R. § 600.310(e)(2)(i)(D).   The SSC then recommends where the Gulf Council should set the Acceptable Biological Catch ("ABC"), which is the level of annual catch that accounts for scientific uncertainty in the estimate of OFL.   *See id*. § 600.310(f)(2)(ii).   ABC must not exceed the OFL, but can be reduced from OFL to create a buffer to account for scientific uncertainty.   *Id*. § 600.310(f)(3).   Once the Gulf Council establishes the ABC, the Gulf Council must then set the ACL.   "ACL cannot exceed the ABC but may be divided into sector-ACLs."   *Id*. § 600.310(f)(2)(iv).   The Gulf Council accordingly sets a commercial sector ACL and a recreational sector ACL that together equal the total red snapper ACL.   The Gulf Council and NMFS have declined to implement a buffer between the commercial or recreational sector ACLs and the ABC to account for management uncertainty.

## FIG. 1 – RELATIONSHIP BETWEEN OFL, ABC, AND ACL



Source: 74 Fed. Reg. 3178, 3180 (Jan. 16, 2009).

52.    The MSA requires all fishery management plans to contain "measures to ensure accountability" with ACLs.  16 U.S.C. § 1853(a)(15).  NMFS guidelines provide that if "the management measures for different sectors differ in the degree of management uncertainty, then sector ACLs may be necessary so that appropriate [accountability measures] can be developed for each sector."  50 C.F.R. § 600.310(f)(5)(ii).

53.    In addition to the requirement to set ACLs and accountability measures under the MSA, Section 407(d)(1) of the MSA, 16 U.S.C. § 1883(d)(1), provides that "any fishery management plan, plan amendment, or regulation submitted by the Gulf Council for the red snapper fishery…shall contain conservation and management measures that…establish separate quotas for recreational fishing…and commercial fishing that, when reached, result in a prohibition on the retention of fish caught during recreational and commercial fishing, respectively, for the remainder of the fishing year." Section 407(d)(2) of the MSA, 16 U.S.C. § 1883(d)(2), provides that these conservation and management measures must "ensure that such quotas reflect allocations among such sectors and do not reflect any harvests in excess of such allocations."

54.     In July 2013 the Gulf  Council approved a framework action, the Red Snapper 2013 Quota Increase and Supplemental Recreational Season ("July Framework Action").  The purpose of the July Framework Action was to increase the commercial and recreational catch limits in response to the completion of a new red snapper stock assessment indicating that catch limits could be higher in 2013 than previously set.   Another purpose of the July Framework Action was to permit a second recreational red snapper season during the fall of 2013 depending on the amount of quota available.  The July Framework Action stated that "[b]ecause of the possibility of an overage during the June season even under an increased quota, all of the alternatives specify that there must be unused quota available for the season to re-open."

55.     The Final Rule being challenged in this case implements the July  Framework Action.

## C.  Management Measures for the Commercial Red Snapper Fishery

56.     The commercial sector of the red snapper fishery operates under an individual fishing quota ("IFQ") program that was implemented in 2007 (the "IFQ Program").  *See* 50 C.F.R. § 622.21.  Under the IFQ Program, eligible participants in the commercial fishery were issued individual allocations of IFQ shares that authorize them to harvest a fixed percentage of the commercial sector ACL.  *See id.*  These IFQ shares are revocable and transferable.  *Id.* §§ 622.21(a), (b)(6), (b)(9).  For each calendar year, NMFS determines the commercial sector ACL and then issues to each holder of red snapper IFQ shares an annual IFQ allocation of fish expressed in pounds, specifying the quantity of fish that can be brought to shore for sale during that calendar year.  *Id.* §§ 622.21(a)(4), (b)(10).

57.     The commercial sector is subject to strict monitoring requirements to ensure that all catches are accurately reported.  Each commercial vessel participating in the red snapper fishery must install and maintain a vessel monitoring system which allows NMFS to track vessel movements.  Each commercial vessel must give notice to NMFS prior to each fishing trip, and before returning to port.  All red snapper must be offloaded at an authorized fish dealer who is required to account for each pound of fish offloaded and to report landings information to NMFS.  This information allows NMFS to manage the commercial sector of the red snapper fishery in close to real time.

58.     Since the commercial IFQ Program was implemented in 2007, the commercial sector has complied with its catch limit every year.

**FIG. 2 - COMMERCIAL SECTOR RED SNAPPER QUOTAS AND LANDINGS 2007-2013**



Source: Final Rule; Framework Action to Set the Red Snapper Quotas and Modify the Recreational Bag Limit (March 2013), Table 1.2

59.     Because the IFQ Program provides effective accountability measures for the commercial sector, the Council has observed that the "commercial sector has not exceeded its quota since the inception of the IFQ program, and therefore there is no buffer [to account for management uncertainty]…. The commercial quota is equal to the commercial ABC."  As

indicated in the July Framework Action, the commercial sector requires no buffer to account for management uncertainty because it is under an IFQ program, has accurate landings data that are reported in real time, and has not exceeded its quota in the last seven years.

60.     Implementation of the commercial IFQ program has produced other economic and conservation benefits for the red snapper fishery.  It has reversed overcapitalization of the fishery, slowed the pace of the commercial fishery, thus reducing loss of life and property at sea from fishing in dangerous conditions, and reduced bycatch of other species, among other benefits.

61.     The commercial IFQ program also has resulted in a steady supply of red snapper available throughout the year, which has allowed new markets to be developed to serve American consumers.  Public demand for red snapper caught by the commercial sector is increasing.

**D.  Management Measures for the Recreational Red Snapper Fishery**

62.     Management measures for the recreational sector are different and more limited.  *See* 50 C.F.R. §§ 622.34 to 622.39.  The recreational sector of the red snapper fishery in federal waters is regulated by NMFS using a limit on the number of fish a recreational participant can bring to shore, known as bag limits; a minimum size of the fish a recreational participant can bring to shore, known as size limits; and a defined period of time for recreational fishing in federal waters, known as the recreational red snapper season.  *See id.* §§ 622.38(b)(3), 622.37(a)(1), 622.34(b), 622.39(c).

63.    Because recreational anglers are permitted to continue to fish in federal and state waters for other species before and after the recreational red snapper season they continue to catch red snapper out of season.

64.    Federal management measures for the recreational fishery are often undermined by inconsistent state laws.  Florida, Alabama, Mississippi, Louisiana and Texas regulate recreational fishing for red snapper in their respective state waters.  Several states have established measures to regulate recreational fishing for red snapper in state waters that are inconsistent with measures established by NMFS to regulate fishing in federal waters.  In 2013, for example, Texas, Louisiana, and Florida established fishing seasons for red snapper in their respective state waters that were considerably longer than the fishing season for red snapper established by NMFS in federal waters.  On September 5, 2013 Florida announced that it was further extending its recreational fishing season for 2013 in state waters from October 1 through October 21.

65.    NMFS has acknowledged that "[i]f states do not comply [with federal measures], then projected reductions in harvest and fishing mortality may not occur, compromising NMFS' ability to end overfishing and rebuild overfished stocks, which is required by the [MSA].  Additionally, inconsistent regulations in state waters complicate law enforcement and may provide fishermen an incentive to harvest greater amounts of fish, regardless of where such fish are caught, which could result in harvest overages."  74 Fed. Reg. 17603, 17606 (Apr. 16, 2009).

66.    NMFS has failed to adopt effective management actions to address the problem of continued overharvesting of red snapper by the recreational sector.  The only

accountability measure used by NMFS to ensure that the recreational sector complies with Section 407(d) of the MSA and adheres to its sector ACL is the closure of the red snapper season in federal waters when it projects that the recreational sector ACL will be met.  But this accountability measure has proven to be ineffective.  The recreational sector routinely exceeds its sector ACL.  Because NMFS is not actively managing the recreational sector with tools that provide real-time assessments of fishing activity, the closures often occur after significant overharvesting by the recreational sector has already occurred.

67.     Section 407(d) was added to the MSA in October, 1996.  In the 17 year period between 1997 and 2013, the recreational sector exceeded its catch limit 10 times.

68.     Congress further amended the MSA effective in 2007 to require accountability measures to ensure that ACLs are adhered to under 16 U.S.C. § 1853(a)(15).  The recreational sector has exceeded its catch limit every year since 2007 but one, 2010, when the Deepwater Horizon oil spill shut down large portions of the Gulf of Mexico to recreational fishing.  These annual overages have been substantial.  In 2012, for example, the recreational sector ACL was 3.989 million pounds of red snapper, but the recreational sector caught 5.823 million pounds of red snapper, an overage of 1.834 million pounds or 46 percent.  In 2013, the recreational sector ACL was 5.39 million pounds of red snapper, but according to preliminary catch data the recreational sector caught at least 9 million pounds and possibly as much as 11 million pounds.

**FIG. 3 - RECREATIONAL SECTOR RED SNAPPER QUOTAS AND LANDINGS
2007-2013**



Source: Gulf Council/NMFS, Scoping Document, Improving Private Recreational Red Snapper Fisheries Data (June 2013) at 3, Table 1.1.1; *see also* NMFS MRIP Catch Estimates, *available at* http://www.st.nmfs.noaa.gov/recreational-fisheries/access-data/run-a-data-query/queries/index.

69.     NMFS has acknowledged this persistent management failure, noting that "the recreational quota has regularly been exceeded" and specifically that "the recreational sector has exceeded its ABC in four of the last five years, by 52% in 2008, 89% in 2009, 18% in 2011 (or by 7% if the 345,000 lb supplemental allocation is included), and 46% based on the preliminary landings for 2012."  Notwithstanding this record of noncompliance, NMFS failed to adopt more effective management and accountability tools to prevent overharvesting by the recreational sector in 2014.

70.     As part of the July  Framework Action, a 20 percent buffer on the recreational sector ACL was considered as a mechanism to absorb foreseeable overages.  The July Framework Action explains that implementing such a buffer is called for under the control rules adopted by the Gulf Council for ensuring compliance with ACLs.  But NMFS failed to adopt the proposed buffer.

71.     Due to the lack of effective accountability measures for the recreational fishing sector, the recreational fishing seasons NMFS authorized in 2013 resulted in catch overages even worse than those observed in prior years.  During the June 2013 season, the recreational sector exceeded its catch limit by 48 percent.   During the October 2013 season, the recreational sector exceeded its catch limit by 108 percent.

72.     When the Gulf Council approved the July Framework Action to increase the recreational and commercial catch limits and set recreational fishing season for October 2013, the extent of the recreational sector's catch overages from the June season was not known. The July Framework Action states that the "length of any [recreational season] re-opening would be based on the landings from the June season subtracted from the total recreational quota (original plus increase)" and that if "landings are over the recreational quota during the June season, the amount of quota available for a re-opening could be reduced or even eliminated."

73.     In setting the October 2013 season, however, NMFS discounted the data indicating that the recreational sector landed nearly two million pounds of red snapper more than its catch limit.  NMFS indicated it could not determine whether the excessive landings were due to better catch monitoring or due to increased effort in the recreational sector.  In either case, the June landings were not "subtracted from the total recreational quota" as specified by the July Framework Action.  Instead NMFS arbitrarily assumed that there was no overage from the June season, determined that the projections used to set the June season were the best estimate of landings during June, and authorized the October season to harvest the full amount of the 1.245 million pound increase in the recreational sector's catch limit for

2013 as a result of the recent stock assessment.  As it turned out, the recreational sector caught 2.585 million pounds of red snapper during the October 2013 season, an overage of 108 percent.

74.     The July Framework Action set the total ACL for the red snapper fishery at 11 million pounds, which was less than the maximum ACL that would have been permitted.  The primary purpose of lowering the ACL in 2013 was to achieve a "constant catch" strategy through 2015, whereby some fish would be left in the water in 2013 in order to allow increased catch limits 2014 and 2015.   Achieving a "constant catch" through 2015 is predicated on the assumption that there will be no overages in the recreational sector.  That assumption is unfounded in light of the substantial catch overages observed during the June and October 2013 recreational seasons.   The failure of NMFS to implement sufficient accountability measures for the recreational sector to address foreseeable catch overages in that sector jeopardizes the ability to achieve a "constant catch" strategy through 2015, and likely will require catch reductions in future years that will penalize the commercial sector for the overages that occurred in the recreational sector.

75.     NMFS previously indicated that catches higher than 11 million pounds in 2013 might require catch reductions in 2014 and 2015 and that catches higher than 12 million pounds could jeopardize the rebuilding plan.  Preliminary catch data indicates that total catch in 2013 was at least 14.5 million pounds and may have been as high as 16.6 million pounds. NMFS failed to conduct any analyses to determine whether the observed 2013 catch levels impacted the stock, the rebuilding plan, or the "constant catch" strategy implemented by the July Framework Action.   NMFS failed to seek input from the Council despite new

information that called into question several of the assumptions on which the July Framework Action was predicated.  NMFS also failed to solicit public comment prior to promulgating the Final Rule and setting the recreational fishing season for 2014.

76.     In promulgating the Final Rule, NMFS failed to implement any accountability measures to address foreseeable catch overages in 2014 and to constrain the recreational sector's catch to its quota.  The Final Rule maintained the recreational sector ACL at 5.39 million pounds without considering the potential impacts to the stock and the rebuilding plan as a result of rampant recreational overharvesting in 2013.  NMFS also established a 40-day recreational fishing season starting June 1, 2014 during which NMFS projects that the recreational sector will harvest its 5.39 million pound quota.  But during a shorter fishing season of just 28 days that NMFS authorized in June 2013, the recreational sector caught 6.13 million pounds of fish.  Extending the duration of the June fishing season by another 12 days in 2014 will therefore result in a massive overage.

77.     Continued catch overages by the recreational fishing sector cause the red snapper stock to rebuild more slowly than it would without such catch overages.  Slower rebuilding of the stock results in lower ACLs than would otherwise be allowed.  Lower ACLs negatively affect all stakeholders in the fishery, including the commercial fishing sector by reducing the amount of fish that participants in that sector, including some of the Plaintiffs, are allowed to catch on an annual basis.

78.     Continued catch overages by the recreational fishing sector and the lack of effective accountability measures create undue risk that the red snapper stock will again be subject to overfishing.  It is possible that overfishing of the stock occurred in 2013 due to

NMFS's failure to implement accountability measures to constrain the recreational sector's catch to its quota. The 40-day season established by the Final Rule may also result in overfishing in 2014.

79.    Annual, foreseeable catch overages by the recreational fishing sector result in a de facto reallocation among the recreational and commercial sectors. This de facto reallocation contravenes the requirement of the Reef Fish FMP that 51 percent of the quota is reserved for the commercial sector and 49 percent is reserved for the recreational sector.

### FIG. 4 - RED SNAPPER COMMERCIAL AND RECREATIONAL LANDINGS

| Year | Commercial | | Recreational | |
|---|---|---|---|---|
| | Pounds (millions) | Percent | Pounds (millions) | Percent |
| 2007 | 3.183 | 41.8% | 4.44 | 58.2% |
| 2008 | 2.484 | 40.1% | 3.712 | 59.9% |
| 2009 | 2.484 | 34.9% | 4.625 | 65.1% |
| 2010 | 3.392 | 60.2% | 2.239 | 39.8% |
| 2011 | 3.594 | 43.8% | 4.603 | 56.2% |
| 2012 | 3.893 | 40.0% | 5.823 | 60.0% |
| 2013 | 5.610 | 38.3% | 9.02** | 61.7% |

Source: 2013 Framework Action; Gulf Council/NMFS, Draft Options Paper for Am. 28 to the Reef Fish FMP (June 2013) at 8, Table 2.1.1; *see also* NMFS MRIP Catch Estimates, available at http://www.st.nmfs.noaa.gov/recreational-fisheries/access-data/run-a-data-query/queries/index. **This figure represents MRIP catch estimates only and excludes Texas and headboat landings. Thus, the actual de facto reallocation in 2013 is likely to be worse once final landings are known.

80.    Through the continued catch overages by the recreational fishing sector NMFS has effectively reallocated the quota between the commercial and recreational fishing sectors without the public processes and analyses required under law. The Final Rule will continue NMFS's de facto reallocation from the commercial sector to the recreational sector.

81.    In promulgating the Final Rule, NMFS failed to adopt a buffer to address management uncertainty in the recreational sector where overharvesting is prevalent as

contemplated by the applicable control rules for the Reef Fish FMP.  The July Framework Action indicates that the 11 million pound ACL in 2013 will allow a "de facto" buffer to address management uncertainty in the recreational sector.   Such a "de facto buffer" arbitrarily penalizes the commercial sector by reducing its catch limit in order to absorb overages by the recreational fishing sector.

### V.        FIRST CAUSE OF ACTION – VIOLATION OF MSA SECTION 407(d)

82.    Paragraphs 1 through 81 are hereby incorporated by reference.

83.    Section 407(d) of the MSA requires that the Reef Fish FMP and implementing regulations governing the red snapper fishery contain conservation and management measures that "establish separate quotas for recreational fishing . . . and commercial fishing that, when reached, result in a prohibition on the retention of fish caught during recreational fishing and commercial fishing, respectively, for the remainder of the fishing year."   16 U.S.C. § 1883(d)(1).

84.    Notwithstanding this requirement, the recreational sector has consistently exceeded its annual catch limit because of NMFS's failure to effectively manage that sector.

85.    The failure to adopt effective management and accountability measures in the Final Rule will result in overharvesting of red snapper by the recreational sector in 2014.

86.    The Final Rule violates Section 407(d) of the MSA.

### VI.        SECOND CAUSE OF ACTION – VIOLATION OF MSA SECTION 303(a)(15)

87.    Paragraphs 1 through 86 are hereby incorporated by reference.

88.    Section 303(a)(15) of the MSA requires NMFS to implement "measures to ensure accountability" with annual catch limits.  16 U.S.C. § 1853(a)(15).

89.     Notwithstanding this requirement, the recreational sector has consistently exceeded its annual catch limit because of NMFS's failure to effectively manage the recreational sector.

90.     The failure to adopt effective management and accountability measures in the Final Rule will result in overharvesting of red snapper by the recreational sector in 2014.

91.     The Final Rule violates Section 303(a)(15) of the MSA.

**VII.     THIRD CAUSE OF ACTION – VIOLATION OF MSA SECTION 304(b)(1)**

92.     Paragraphs 1 through 91 are hereby incorporated by reference.

93.     Under Section 304(b)(1) of the MSA, conservation and management measures must be consistent with the governing FMP.  16 U.S.C. § 1854(b)(1) (NMFS shall determine if implementing regulations are consistent with FMP and return them to the appropriate fishery management council if inconsistent).

94.     The Reef Fish FMP divides the total red snapper ACL into sector ACLs.  The commercial sector ACL constitutes 51 percent of the total red snapper ACL.  The recreational sector ACL constitutes 49 percent of the total red snapper ACL.  Yet in 2007, 2008, 2009, 2011, 2012, and 2013, the recreational sector accounted for 58.2 percent, 59.9 percent, 65.1 percent, 56.2 percent, 60.0%, and at least 61.7%, respectively, of total red snapper landings.

95.     NMFS's failure to effectively manage the recreational sector has allowed the recreational sector to regularly exceed its catch limits and the failure to adopt effective management and accountability measures in the Final Rule will result in overharvesting of red snapper by the recreational sector in 2014.

96.     The Final Rule is inconsistent with the Reef Fish FMP and therefore violates Section 304(b)(1) of the MSA.

## VIII.   FOURTH CAUSE OF ACTION – VIOLATION OF NATIONAL STANDARD 4

97.     Paragraphs 1 through 96 are hereby incorporated by reference.

98.     The MSA provides that "[i]f it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; [and] (B) reasonably calculated to promote conservation . . . ." 16 U.S.C. § 1851(a)(4) ("National Standard 4").

99.     NMFS has promulgated guidelines to implement National Standard 4.  Those guidelines provide that "[a]n allocation scheme may promote conservation by encouraging a rational, more easily managed use of the resource." 50 C.F.R. § 325(c)(3).

100.    The current conservation and management measures governing the commercial sector of the red snapper fishery, i.e., the IFQ Program, make it a more easily managed use of the resource.

101.    NMFS's failure to adopt effective management and accountability measures has resulted and, under the Final Rule, will continue to result in overharvesting of red snapper by the recreational sector.  The Final Rule will result in a de facto reallocation from the commercial sector to the recreational sector.

102.    Such reallocation does not comply with National Standard 4 as interpreted by NMFS in the implementing guidelines, and it is neither fair, equitable, nor reasonably calculated to promote conservation.

103.    The Reef Fish FMP and the Final Rule violate National Standard 4.

### IX.     FIFTH CAUSE OF ACTION – VIOLATION OF NATIONAL STANDARD 5

104.    Paragraphs 1 through 103 are hereby incorporated by reference.

105.    The MSA requires that "[c]onservation and management measures shall, where practicable, consider efficiency in the utilization of fishery resources, except that no such measure shall have economic allocation as its sole purpose."  16 U.S.C. § 1851(a)(5) ("National Standard 5").

106.    The decision by the Gulf Council and NMFS to forgo a buffer on the recreational sector ACL when developing the July Framework Action and promulgating the Final Rule had economic allocation as its sole purpose.

107.    The Final Rule violates National Standard 5.

### X.      SIXTH CAUSE OF ACTION – VIOLATION OF NATIONAL STANDARD 2

108.    Paragraphs 1 through 108 are hereby incorporated by reference.

109.    The MSA requires that "[c]onservation and management measures shall be based upon the best scientific information available." 16 U.S.C. § 1851(a)(2) ("National Standard 2").

110.    The Final Rule disregards superior data regarding catch overages in the recreational sector and is not based upon the best scientific information available.

111.    The Final Rule violates National Standard 2.

### XI.     SEVENTH CAUSE OF ACTION – VIOLATION OF MSA SECTIONS 301(a)(1) and 303(a)(1)(A)

112.    Paragraphs 1 through 111 are hereby incorporated by reference.

113.    Sections 301(a)(1) and 303(a)(1)(A) of the MSA require that all conservation and management measures prevent overfishing and achieve rebuilding.  *See* 16 U.S.C. §§ 1851(a)(1), 1853(a)(1)(A).

114.    NMFS's failure to adopt effective management and accountability measures has resulted and, under the Final Rule, will continue to result in overharvesting of red snapper by the recreational sector.  These overages slow the rebuilding of the red snapper stock and pose an unreasonable risk of causing overfishing and preventing rebuilding.

115.    The Reef Fish FMP, the Final Rule and the Temporary Rule violate Sections 301(a)(1) and 303(a)(1)(A) of the MSA.

## XII.    EIGHTH CAUSE OF ACTION – VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT

116.    Paragraphs 1 through 115 are hereby incorporated by reference.

117.    In promulgating the Final Rule, NMFS acted arbitrarily and capriciously and in violation of law in violation of the APA.

118.    NMFS failed to implement a buffer on the recreational sector ACL as called for by the Gulf Council's control rules.     In light of the repeated catch overages by the recreational sector, the decision to forgo a buffer was arbitrary and capricious.

119.    Under the Final Rule NMFS adopted an 11 million pound ACL for the red snapper fishery in 2014 in order to maintain a "constant catch"  through 2015 but arbitrarily failed to implement sufficient accountability measures to address foreseeable overages by the recreational fishing sector that will jeopardize the ability to maintain such a "constant catch." NMFS also indicated that the 11 million pound ACL would allow a "de facto buffer" to address management uncertainty in the recreational sector, but NMFS failed to acknowledge

that reliance on such a "de facto buffer" would jeopardize the ability to maintain a "constant catch" through 2015. Moreover, to the extent that the 11 million pound ACL operates to allow a "de facto buffer," it arbitrarily penalizes the commercial sector by reducing the catch limit applicable to that sector to absorb catch overages that occur only in the recreational sector.

120.    In allowing a 40-day recreational fishing season in June 2014 for the recreational sector to catch its 5.39 million pound quota, NMFS arbitrarily relied on the same projection models that have repeatedly proven to underestimate recreational catches. NMFS ignored the fact that a 28-day recreational season in June 2013 resulted in a catch of 6.13 million pounds, thereby ensuring that the 40-day recreational season in June 2014 will cause the recreational sector to grossly exceed its sector ACL in 2014.

121.    NMFS failed to make a rational connection between the facts found and the choices made, entirely failed to consider important aspects of the problem, and failed to adequately explain their actions in violation of the APA.

122.    The Reef Fish FMP and the Final Rule violate the APA.

**XIII.   NINTH CAUSE OF ACTION – VIOLATION OF THE NATIONAL ENVIRONMENTAL POLICY ACT**

123.    Paragraphs 1 through 122 are hereby incorporated by reference.

124.    NEPA requires that a federal agency assess the environmental consequences of its actions, including evaluating a reasonable suite of alternatives and collecting and analyzing information as appropriate. *See* 42 U.S.C. § 4332.

125.    The Environmental Assessment purportedly supporting the Final Rule does not comply with the standards established in NEPA and implementing regulations.

126.   The Final Rule violates NEPA.

## XIV.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

1.   Enter a declaratory judgment that the regulations establishing the conservation and management measures for the recreational sector of the red snapper fishery under the Final Rule and the Reef Fish FMP are arbitrary, capricious and in violation of the Magnuson-Stevens Fishery Conservation and Management Act, the Administrative Procedure Act, and NEPA;

2.   Vacate the regulations establishing the conservation and management measures for the recreational sector of the red snapper fishery under the Final Rule and the Reef Fish FMP and remand them to NMFS with instructions to develop, in cooperation with the Gulf of Mexico Fishery Management Council and fishery stakeholders, and implement:

   (a) prior to June 1, 2014, revisions to the Reef Fish FMP in the form of conservation and management measures that will hold the recreational sector accountable for exceeding the recreational sector ACL;

   (b) prior to June 1, 2014, revised regulations governing the recreational sector including improved accountability measures that will result in catches by the recreational sector at or below the recreational sector ACL; and

         (c) prior to June 1, 2014, adjustments to the recreational sector ACL with buffers that adequately reflect and account for the management uncertainty and catch overages of the recreational sector;

3.      Award Plaintiffs their fees, expenses, and costs pursuant to Equal Access to Justice Act, 28 U.S.C. § 2412(d); and

4.      Such other and further relief as this Court deems just and appropriate.

DATED this 10th day of January, 2014.

                K&L GATES LLP


By:              
          Michael F. Scanlon (DC Bar # 479777)
          Michael.Scanlon@klgates.com
          1601 K Street, NW
          Washington, DC 20006
          Telephone: (202) 661-3764
          Facsimile: (202) 778-9100

          J. Timothy Hobbs (*pro hac vice Pending*)
          Tim.Hobbs@klgates.com
          925 Fourth Avenue, Suite 2900
          Seattle, WA  98104
          Telephone:     (206) 623-7580
          Facsimile:     (206) 623-7022

          Attorneys for Plaintiffs